LAUREN I. SCHOLNICK (Bar No. 7776)
CAMERON PLATT (Bar No. 16548)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
Telephone:    (801) 359-4169
Facsimile:     (801) 359-4313
Email: lauren@utahjobjustice.com

MICHAEL J. TETER (Bar No. 16734)
**TETER & VU LLC**
57 W. 200 South, Suite 250
Salt Lake City, Utah 84101
Telephone:    (801) 810-0365
Email: michael@tetervu.com

Attorneys for Plaintiff

---

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **CARRIE SPANGLER**, <br><br> Plaintiff, <br><br> vs. <br><br> **UNIVERSITY OF UTAH, CRAIG H. SELZMAN, in his official and individual, and THOMAS K. VARGHESE Jr., in his official and individual capacity,** <br><br> Defendants. | **COMPLAINT AND JURY DEMAND** <br><br> Case No. <br> Judge |

Plaintiff Carrie Spangler ("Dr. Spangler" or "Plaintiff"), by and through her

undersigned attorneys, hereby complains against the University of Utah ("University"),

Dr. Craig H. Selzman ("Selzman"), and Dr. Thomas K. Varghese Jr. ("Varghese")

(collectively "Defendants") as follows:

## I. NATURE OF CLAIMS

1.      This is an action for damages due to Defendants violating Dr. Spangler's

rights under the United States Constitution, as well as the following statutes:

      a.      Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et

seq. (Rehabilitation Act);

      b.      Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq* ("Title VII");

      c.      Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et

seq* ("Title IX");

      d.      Family and Medical Leave Act of 1993, 29 U.S.C. § 2601

("FMLA"); and

      e.      42 U.S.C. § 1983.

2.      Dr. Spangler seeks equitable relief, back and front pay and benefits,

emotional distress, reputational damages, punitive damages, and attorneys' fees, costs, and

interest.

## II. PARTIES

3.       Dr. Spangler is a citizen of the State of Louisiana.

4.      At all times relevant to this case, the University employed Dr. Spangler as a

Fellow in its Cardiothoracic Surgeon Program.

5.     Defendant University is an institution of higher education formed and existing under Utah Code Ann. § 53B-2-101.

6.     Defendant Craig Selzman is Chief of the Division of Cardiothoracic Surgery at the University.

7.     Defendant Thomas Varghese Jr. is Program Director of the Cardiothoracic Surgery Fellowship at the University.

## III. JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under federal law.

9.     Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred within the jurisdiction of this Court.

## IV. ADMISTRATIVE PROCEEDINGS

10.     Dr. Spangler filed a timely Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC").

11.     On or about January 22, 2020, the U.S. Department of Justice issued Dr. Spangler a Notice of Right to Sue on her Charge.

12.     This Complaint was timely filed and all administrative prerequisites have been met.

## V. GENERAL ALLEGATIONS

13.     The University accepted Dr. Spangler into the Department of Surgery,

Division of Cardio-Thoracic Surgery ("CT") fellowship program ("Program"), beginning

in August 2016 with an anticipated July 2018 completion date.

14.     At all times relevant to this matter, Selzman and Varghese were University

professors and clinicians and the Division Chief and Program Director, respectively; and

assigned Dr. Spangler to work under the supervision of other medical practitioners, both

at the University and other affiliated medical facilities.

15.     The Program had a history of admitting very few females and, in 2016, Dr.

Spangler was the only female fellow.

16.     From the start, Defendants treated Dr. Spangler differently than they did the

male fellows. Program administrators, including Selzman and Varghese, criticized Dr.

Spangler's friendly nature with nurses, going as far as to forbid her from befriending

nurses, even while permitting male fellows to fraternize with female nurses.

17.     Defendants were aware that male fellows had romantic and sexual

relationships with female nurses.

18.     Varghese also prohibited Dr. Spangler from speaking in confidence to other

fellows, while imposing no such restriction on male fellows.

19.     These directives left Dr. Spangler isolated from any potential ally within

the Program, which is particularly harmful in a surgical training program.

20.     During the first four months of her employment, Dr. Spangler received only positive verbal feedback about her work performance, even though they treated her unfavorably due to her gender.

21.     Then, in January 2017, Varghese met with Dr. Spangler during her first evaluation (also known as a "milestone") meeting and raised concerns about her performance to date and placed her on a remediation plan, although she had been performing at a quantitatively higher level than many of her male colleagues, who were not given remediation plans.

22.     According to Defendants, Dr. Spangler "responded well to those critiques" and exceeded the level of performance that Defendants set for her at that meeting.

23.     The University cleared her to proceed to her second year of fellowship without any restriction in September 2017.

24.     As a standard part of the Program's requirements, Dr. Spangler was required to complete two three-month rotations at a Program affiliate, Intermountain Medical Center ("IMC").

25.     The rotation's purpose is to provide fellows firsthand experience performing cardiothoracic surgeries.

26.     Therefore, the Program requires CT fellows to perform cardiothoracic surgeries as "first surgeon," which is the surgeon primarily responsible for performing the surgery.

27.     At all times relevant to this matter, Dr. John Doty ("Doty") was the head of the fellows' rotation at IMC.

28.     During both of her IMC rotations, from February to April 2017 and again from October to December 2017, Doty and other supervising surgeons refused to allow Dr. Spangler to perform cardiothoracic surgeries, relegating her only to a "watch and see" role.

29.     The supervising surgeons decided that of all fellows, Dr. Spangler was the only one who they would refuse to allow to perform surgeries.

30.     In contrast, Doty permitted the male fellows to perform as "first surgeons," providing those fellows with the necessary opportunities to develop the competencies and refine their technical skills required to graduate from the Program.

31.     There was never any allegation that Dr. Spangler lacked skills to serve as a "first surgeon."

32.     But IMC surgeons told Dr. Spangler that "women do not belong in the operating room," "women need to stay home and make babies," "you should be home making babies and taking care of the house" and was called demeaning names based on her gender such as "Swamp Diva."

33.     Dr. Spangler reported to Varghese, during both IMC rotations, that IMC surgeons were subjecting her to both sexual harassment and gender discrimination by refusing to allow her to perform as a "first surgeon," thus refusing her the opportunity to

increase her skillset.

34.     Further, Dr. Spangler informed Varghese that she was worried that she was not allowed to log the required hours to pass the Program.

35.     Instead of investigating and remedying the lack of allowed time as "first surgeon," Varghese told Dr. Spangler to simply record the cases, which she only observed, as "first surgeon" time.

36.     Dr. Spangler also spoke with Selzman about her concerns. He, too, acknowledged IMC doctors were disfavoring her compared with her male peers in training she received.

37.     Selzman, however, did nothing about it, stating that he was confident that she could get caught up in her final three months on cardiac rotation at the University hospital.

38.     In addition, like Varghese, Selzman directed Dr. Spangler to log surgeries at IMC, even if the only thing she did was scrub but played no log-worthy role, and assured Dr. Spangler that she would graduate on time.

39.     Both Varghese and Selzman advised Dr. Spangler to "get what [she] could out of [her] time at IMC," "just get through the rotation," and "there was value in watching cases."

40.     All the while, Dr. Spangler continued to face mistreatment at University Hospital, IMC, and VA Hospital (another University affiliate).

41.     The surgeons at all three hospitals also subjected Dr. Spangler to verbal, sexual abuse. For example, one University Hospital and VA Hospital surgeon, Doug Appleby, frequently tried to engage Dr. Spangler in discussions during surgery about penis size and sexual excitement.

42.     In another example, Appleby required Dr. Spangler to use a cross-clamp for the first time, reprimanding her technique because she had "small female hands and couldn't spread them far enough" to utilize the clamp the same way he did.

43.     The unchecked sexual overtures of supervising surgeons provided tacit approval of other's sexually explicit treatment of her.

44.     Specifically, one male surgeon at IMC made a sexual overture stating: "I can remind you how to make babies in case you forgot" and a male fellow requested that Dr. Spangler send him photographs of her "butt."

45.      Dr. Spangler continued to raise concerns of this sexual and genderized inappropriate treatment with Varghese, but Varghese and the University did nothing to investigate or remedy her repeated reports.

46.     To the contrary, Varghese later admitted he failed to convey Dr. Spangler's reports to anyone within University administration.

47.     Because the male-dominated, sexually charged environment at the hospitals went largely unchecked, ultimately, in Summer 2017 during a surgery, Dr. Spangler was sexually assaulted by a male physician's assistant, who groped her on the top of her inner

thigh so forcefully that it left a bruise.

48.     Dr. Spangler immediately reported the sexual assault to Varghese who told her to "ignore it and just do [her] job."

49.     The University went beyond simply failing to investigate her reports; it began retaliating against her for her temerity in making those reports.

50.     On October 15, 2017, Dr. Spangler sent Selzman and Varghese a confidential email again reporting the gender discrimination she experienced at IMC.

51.     Shortly thereafter, Varghese retaliated against Dr. Spangler for making the report by reprimanding her in front of her colleagues for "unprofessionalism" and Dr. Spangler was written up for using email to report discrimination and the assault against her.

52.     In late January 2018, Dr. Spangler became acutely ill, suffering from iron deficiency anemia.

53.     She requested ADA accommodations but was instead told that she would have to take FMLA leave instead.

54.      Dr. Spangler was concerned about taking FMLA leave, because she was worried it would compromise her ability to complete the CT Program on time.

55.     Nevertheless, without an accommodation, Dr. Spangler had no choice but to take the FMLA leave. During that time, her doctors treated her for the iron deficiency anemia.

56.     During her FMLA leave, Dr. Spangler pleaded with the University for an accommodation so she could return to work. Her doctors provided letters supporting her ability to return to work with minimal accommodations.

57.     However, the University rejected all requests for accommodation, stating that "the ADA does not apply to the Program" and further that "the ability to perform and attend prolonged cardiothoracic surgical procedures is an important essential function of your position, therefore no accommodation waiving your performance of that essential function could be granted."

58.      Dr. Spangler had not requested a waiver of any performance of surgical procedures — instead, Dr. Spangler wanted to return as soon as possible primarily so she could return to the operating room to perform surgeries.

59.     Specifically, Dr. Spangler, in consultation with her treating physicians, requested the University alter her work in the following reasonable ways: the "ability to take breaks (with backup of P[hysician] A[ssistants] so no endangerment of patients)," the ability to "maintain hydration," and the ability to attend infusions and other medical appointments.

60.     Because the University refused any accommodation or even a discussion to fashion an accommodation that may have worked, Dr. Spangler could not return and lost more than a month of training time during which she could, and should, have otherwise worked.

61.     While still on FMLA leave, Varghese demanded that Dr. Spangler meet with him on April 2, 2018 to discuss her return to work.

62.     Varghese presented Dr. Spangler with a letter, signed by both he and Selzman, threatening to terminate her fellowship if she did not return to work by April 15, 2018, which was prior to when her physicians thought she should return to work (unless the University provided the reasonable accommodations above and before exhaustion of her FMLA leave).

63.     The doctors' vague letter alleged that Dr. Spangler was deficient in required competencies and cardiac skills, because she had taken FMLA leave—although there was not one competency or skill noted for which she was deficient.

64.     Further, Dr. Spangler had no cardiac deficiencies and had missed no cardiac training while on leave.

65.     On May 4, 2018, Dr. Spangler met with Varghese, Poss, and Program administrators to discuss her future with the University and her return to work from FMLA leave.

66.     At the meeting, those present pressured Dr. Spangler to name the individuals who had sexually harassed her.

67.     Dr. Spangler protested, stating she had already reported those involved to Varghese after the assault in Summer 2017 and that she simply wanted to continue and finish the program.

68.     Varghese denied her prior report, but he and Poss promised that if Dr. Spangler provided just one name, they would guarantee that she would not have to work with that person until the University completed an investigation.

69.     Relying on this promise and guarantee, Dr. Spangler provided the name of just one of the abusers, Appleby, who had been one of the more vocal surgeons discussing penis size, sexual excitement, and making other inappropriate statements while she was operating with him.

70.     Oddly, Varghese then blamed Dr. Spangler for the continuing sexual harassment she was experiencing and denied that any responsibility to take action of any action regarding any sexual harassment or assault she had reported.

71.     Despite their promise, Poss and Varghese assigned Dr. Spangler to operate with Appleby numerous times that month, more than with any other supervising surgeon.

72.     Indeed, Appleby served as Dr. Spangler's primary evaluator for the surgeries she performed with him.

73.     Clearly, Verghase and Poss chose to tell Appleby that Dr. Spangler reported him, as Appleby attacked her for reporting him on her first day back in surgery on May 16, 2018.

74.     Specifically, Appleby warned Dr. Spangler not to discuss the matter with anyone and threatened her position, stating he would "get [her] into trouble," an inherent threat that, as her primary evaluator and operative educator for the entire month of May,

he could and would ruin her career.

75.     Notwithstanding these threats, Dr. Spangler immediately informed Selzman, who promised to investigate but then left on a two-week trip during which he was completely unreachable, doing nothing to protect Dr. Spangler or to initiate University sexual harassment and retaliation policies, as required.

76.     Before returning to work from FMLA leave, Dr. Spangler learned that there was an opening for a second year CT fellow at the University of Kansas ("Kansas").

77.      Dr. Spangler was fearful of, and frustrated with, her Program leaders' termination threats and hostile demeanor toward her, so she pursued the opportunity at Kansas.

78.      Dr. Spangler met Varghese and informed him of her wish to transfer to Kansas.

79.      Varghese told Dr. Spangler that he: 1) supported her desire to transfer; 2) had been contacted by the Kansas program director; and 2) had given Kansas a positive reference for Dr. Spangler.

80.      However, during Dr. Spangler's interview with Kansas, the program director informed Dr. Spangler that he had been contacted by someone from the University, who informed him that the University did not support her transfer and, instead, would complete her training, making the transfer appear unnecessary.

81.      Further, Dr. Spangler learned that someone had "warned" Kansas that she

had hired an attorney and made accusations of sexual harassment against employees of the University.

82.     Unfortunately, Kansas did not offer Dr. Spangler the position after its communication with the University.

83.     Upon Dr. Spangler's return to the University, Selzman informed her that he was concerned that she would not be able to catch up and that the University did not have the resources to extend her training.

84.     Further, Selzman informed Dr. Spangler that she could stay in the program and that he would do everything he could do to help her succeed and that he would take her "under his wing."

85.     Selzman further acknowledged the teaching deficiencies in the attending surgeons with whom Dr. Spangler was set to train (Appleby, Glotzbach, and Sharma).

86.     Although Dr. Spangler would have preferred to transfer to Kansas for a fresh start in what was purported to be a more female-friendly fellowship environment, she was pleased that the University had committed to her completing her fellowship.

87.     However, less than a month later, on June 4, 2018, Selzman and Varghese met with Dr. Spangler and told her that her technical skills were not at the level expected in one's 19th month of the Program based on supposed technical deficiencies reported by largely by Appleby.

88.     Further, it is contradicted by the fact that Dr. Spangler had been promoted

14

to her final year of the fellowship the previous September, at which time no major concerns were raised about her performance, nor were there any indications that she was not at the level she should be at.

89.     Instead, the June 4th meeting was the only time Dr. Spangler was provided with any notice of specific technical deficiencies.

90.     Selzman and Varghese offered no explanation for why they were raising these supposed skill deficiencies for the first time.

91.     They also referred to two earlier "investigations" that Dr. Spangler had never previously heard about. They relied on these as further bases for Dr. Spangler's termination.

92.     The University never provided Dr. Spangler any description of the basis for the investigations, nor did it provide her the opportunity to defend herself, which violates University policies.

93.      Dr. Spangler relied to her detriment on Defendants' repeated assurances that they would ensure that she completed the Program successfully by providing her the necessary training opportunities.

94.     Instead, Defendants gave Dr. Spangler the undesirable option of being terminated or resigning.

95.     Defendants knew this was not a true choice if Dr. Spangler wished to protect her future career, so Dr. Spangler resigned on June 4, 2018.

96.     As a result of the forced resignation, Dr. Spangler was unable to challenge

her termination under University Policy GME 12.1, permitting an appeal from

termination.

## FIRST CAUSE OF ACTION
### (Failure to Accommodate Violating Section 504 of the Rehabilitation Act)

97.     Dr. Spangler incorporates the allegations contained in the preceding

paragraphs as if fully set forth herein.

98.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 791, et seq., expressly

prohibits discrimination in employment based on disability by any program or entity

receiving federal financial assistance.

99.     Defendant University of Utah receives federal financial assistance

rendering Section 504 of the Rehabilitation Act applicable to it.

100.    Dr. Spangler is an individual with disabilities under the Rehabilitation Act.

101.    The University's conduct as alleged herein violated 29 U.S.C. § 794, which

provides:

>  No otherwise qualified individual with a disability in the United States, as
>  defined in section 705(20) of this title, shall, solely by reason of her or his
>  disability, be excluded from the participation in, be denied the benefits of,
>  or be subjected to discrimination under any program or activity receiving
>  Federal financial assistance or under any program or activity conducted by
>  any Executive agency or by the United States Postal Service.

102.    Dr. Spangler is a qualified individual with a disability within the meaning

of Section 504 of the Rehabilitation Act in that she was, at all times relevant, able to

perform the essential functions of her fellowship with or without reasonable

accommodation.

103.    When the University learned that Dr. Spangler had a disability, it failed to enter the interactive process to fashion a reasonable accommodation, and, instead, rejected her proposed reasonable accommodations in violation of the Rehab Act, 29 U.S.C. § 794.

104.    As a result of these violations, Dr. Spangler is entitled to recover damages for lost back and future wages and benefits, plus prejudgment interest on those amounts.

105.    As a further proximate result of the University's discriminatory actions, as alleged above, Dr. Spangler has been harmed in that she has suffered mental anguish, and emotional and physical distress, in an amount to be proven at trial.

106.    She is also entitled to recover her attorneys' fees and costs expended in prosecuting this action and any other relief as provided under 29 U.S.C. § 794a.

### SECOND CAUSE OF ACTION
#### (Retaliation Violating Section 504 of the Rehabilitation Act)

107.    Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

108.    Dr. Spangler notified Defendants of her disability and requested accommodations that would allow her to perform her work in, and complete, the CT Program.

109.    After Dr. Spangler's request for accommodations, Defendants reprimanded her for requesting accommodations, refused her requests, and terminated her Fellowship

and employment.

110.   Defendants would not have terminated Dr. Spangler's Fellowship and employment but for her lawful request of accommodation.

111.   As a result of these violations, Dr. Spangler is entitled to recover damages for lost back and future wages and benefits, plus prejudgment interest on those amounts.

112.   As a further proximate result of the University's discriminatory actions, as alleged above, Dr. Spangler has been harmed in that she has suffered mental anguish, and emotional and physical distress, in an amount to be proven at trial.

113.   She is also entitled to recover her attorneys' fees and costs expended in prosecuting this action and any other relief as provided under 29 U.S.C. § 794a.

**THIRD CAUSE OF ACTION**
**(Sexual Harassment Violating Title VII)**

114.   Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

115.   Dr. Spangler notified Defendants that she experienced sexual harassment from co-workers and supervisors in the form of sexual comments and a sexual assault.

116.   Dr. Spangler did not solicit or encourage the sexual comments or assault and regarded the conduct as offensive and unwelcomed.

117.   The sexual harassment was both severe and pervasive because Dr. Spangler was sexually assaulted and frequently experienced these sexual comments at work.

118.   The conduct complained of was sufficiently severe or pervasive to alter the

terms and conditions of Dr. Spangler employment by creating an abusive working environment.

119.    The University knew about the sexual harassment that Dr. Spangler experienced, as she reported it, but it failed to investigate and implement reasonably prompt and appropriate corrective action.

120.    As a result of University's violations of Title VII, Dr. Spangler suffered damages, including lost compensation, lost benefits, and non-pecuniary damages including, but not limited to, emotional distress, damage to reputation, loss of enjoyment of life, and humiliation, pursuant to 42 U.S. Code § 2000e.

121.    Additionally, Plaintiff is entitled to recover all attorneys' fees and costs expended in prosecuting this action.

**FOURTH CAUSE OF ACTION**
**(Gender Discrimination Violating Title VII)**

122.    Dr. Spangler incorporates the allegations contained in the preceding paragraphs, as if fully set forth herein.

123.    As a female, Dr. Spangler is a member of a protected class under Title VII.

124.    Defendants treated Dr. Spangler differently than male Fellows in the CT Program by denying her similar training, refusing to correct the denial of training, and then using that discriminatory denial to terminate Dr. Spangler's Fellowship and employment, allegedly, because she had not progressed sufficiently in the program.

125.    Dr. Spangler's gender was a motivating factor in Defendants' termination

of her Fellowship and employment.

126.    As a result of University's violations of Title VII, Dr. Spangler suffered

damages, including lost compensation, lost benefits, and non-pecuniary damages

including, but not limited to, emotional distress, damage to reputation, loss of enjoyment

of life, and humiliation, pursuant to 42 U.S. Code § 2000e.

127.    Additionally, Plaintiff is entitled to recover all attorneys' fees and costs

expended in prosecuting this action.

### FIFTH CAUSE OF ACTION
### (Retaliation Violating Title VII)

128.    Dr. Spangler incorporates the allegations contained in the preceding

paragraphs as if fully set forth herein.

129.    Dr. Spangler complained to Defendants that she was experiencing both

sexual harassment and gender discrimination.

130.    Shortly after making the above complaint, Defendants retaliated against Dr.

Spangler by threatening to put her on probation, assigning her to work with one of her

harassers, threatening to terminate her position in the CT Program, and ultimately

terminating her employment.

131.    Defendants' deprivation of Dr. Spangler's rights is causally linked to her

efforts to exercise her rights.

132.    As a result of these violations of Title VII, Dr. Spangler suffered damages,

including lost compensation, lost benefits, and non-pecuniary damages including, but not

limited to, emotional distress, damage to reputation, loss of enjoyment of life, and humiliation, pursuant to 42 U.S. Code § 2000e.

133.    Additionally, Plaintiff is entitled to recover all attorneys' fees and costs expended in prosecuting this action.

## SIXTH CAUSE OF ACTION
### (Gender Discrimination Violating Title IX)

134.    Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

135.    Dr. Spangler is a member of a protected class under Title IX because she is female.

136.    Defendants treated Dr. Spangler differently than male Fellows in the CT Program by denying her similar training, refusing to correct the denial of training, and terminated Dr. Spangler's Fellowship and employment because she had not progressed sufficiently in the program.

137.    Defendants' actions deprived Dr. Spangler of equal access to an education.

138.    Dr. Spangler has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to statute, she is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

## SEVENTH CAUSE OF ACTION
### (Retaliation Violating Title IX)

139.   Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

140.   Dr. Spangler complained to Defendants that she was experiencing sexual harassment and discrimination because she was a woman.

141.   Shortly after making the above complaint, Defendants retaliated against Dr. Spangler by threatening to put her on probation, assigning her to work with one of her harassers, threatened to terminate her position in the CT Program, and ultimately following through with its threats and terminating her employment.

142.   Defendants' actions deprived Dr. Spangler of equal access to an education.

143.   Dr. Spangler has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to statute, she is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

## EIGHTH CAUSE OF ACTION
### (Interference and Retaliation Violating FMLA)

144.   Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

145.   University is an employer under the FMLA who employs 50 or more employees within a 75-mile radius its Salt Lake City location.

146.   University employed Dr. Spangler as a Fellow in its CT Program from

April 2016 through June 2018, where she worked more than 1,250 hours in the 12 months prior to her termination.

147.    When Dr. Spangler requested an accommodation from Defendants, it forced Dr. Spangler to go on FMLA leave rather than allow her to determine when or whether she wanted to use FMLA leave.

148.    In addition, after forcing Dr. Spangler to use FMLA leave, Defendants interfered with her leave from work by contacting her and requiring her to meet and/or communicate with Defendants, threatening to terminate her if she did not return prior to the expiration of her leave, and criticized her performance because she had taken FMLA leave.

149.    Defendants terminated Dr. Spangler within one month of her return to work from FMLA leave in retaliation for her use of leave.

150.    Defendants' deprivation of Dr. Spangler's rights is causally linked to her efforts to exercise her rights.

151.    Dr. Spangler has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 29 U.S. Code § 2617, she is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees, interest, and liquidated damages.

## NINTH CAUSE OF ACTION
### (Gender Discrimination, Harassment and Retaliation Violating 42 U.S.C. § 1983 – Equal Protection against all Defendants)

152. Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

153. Defendants denied Dr. Spangler's rights by discriminating and retaliating against her because of her gender, subjecting her to sexual harassment, failing to implement reasonably prompt and appropriate corrective action when Dr. Spangler reported sexual harassment and discrimination.

154. Defendants' deprivation of Dr. Spangler's rights is causally linked to her efforts to exercise her rights.

155. Defendants acted under the color of law.

156. Defendants' conduct violated clearly established constitutional rights of which a reasonable person should have known.

157. Dr. Spangler has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, she is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees against Selzman and Varghese in their individual capacities and equitable relief against University and Selzman and Varghese in their official capacity.

158. The individual Defendants' conduct was willful and intentional, malicious,

and exhibits reckless or callous indifference to Dr. Spangler's constitutional rights, thereby entitling him to punitive damages.

## TENTH CAUSE OF ACTION
### (42 U. S. C. § 1983 – Due Process Violations against all Defendants)

159.    Dr. Spangler incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

160.    Defendants denied Dr. Spangler's due process rights under the Fourteenth Amendment.

161.    Dr. Spangler possessed a property interest in her continued employment at the University.

162.    Dr. Spangler possessed a liberty interest in her reputation.

163.    Defendants failed to afford Dr. Spangler with the process provided for in the University's policies and handbooks regarding disciplinary matters and the right to appeal.

164.    Defendants' conduct deprived Dr. Spangler of her employment with the University and damaged her reputation.

165.    In so doing, Defendants acted under the color of law.

166.    Defendants' conduct violated clearly established constitutional rights of which a reasonable person should have known.

167.    Dr. Spangler has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, she is entitled to all available

relief, including back pay, reinstatement and/or front pay, actual and compensatory damages, and punitive damages, as well as costs and attorney fees.

## JURY DEMAND

Dr. Spangler requests a trial by jury of any issue triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Spangler prays for judgment against Defendant as follows:

1.     For equitable relief in form of reinstatement or front pay;

2.     For an order and judgment against Defendant for appropriate back pay, lost benefits and reimbursement for Dr. Spangler's other pecuniary losses;

3.     For compensatory damages to compensate Dr. Spangler for her emotional distress, loss of enjoyment of life, damage to reputation, and other non-pecuniary losses, in amounts to be established at trial;

4.     For punitive damages based on Defendants' conduct;

5.     For Dr. Spangler's reasonable attorneys' fees and costs; and

6.     For such further injunctive relief as is necessary to eliminate and prevent Defendants' discriminatory conduct and to make Dr. Spangler whole;

7.     Pre- and post-judgment interest in such amounts as are permitted by law; and

8.     For such further and other relief the Court deems appropriate.

DATED this 20th day of April, 2020.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Lauren I. Scholnick
Lauren I. Scholnick

**TETER & VU LLC**

/s/ Michael J. Teter
Michael J. Teter

Attorneys for Dr. Spangler

CurrentClientsUT\Spangler, Carrie\Pleadings\Spangler Complaint final.docx